## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOSEPH G. BRYANS | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:11-CV-01263(JCH) |
| v. | : | |
| | : | |
| EVAN COSSETTE, ET AL | : | AUGUST 30, 2013 |
| Defendants. | : | |

### RULING RE: DEFENDANT EVAN COSSETTE'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 132) AND MOTION TO PRECLUDE (Doc. No. 133) AND DEFENDANT MIDSTATE MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 135)

## I.     INTRODUCTION

Plaintiff Joseph Bryans ("Bryans") brings this action against defendants Evan Cossette ("Cossette") and Midstate Medical Center ("Midstate").  In Count One, Bryans alleges that Cossette violated sections 1983 and 1988 of title 42 of the United States Code by subjecting him to unreasonable force and by being deliberately indifferent to his serious medical needs.  Am. Compl. (Doc. No. 110) ¶¶ 36-37.  In Count Two, Bryans alleges that Midstate unlawfully restrained and falsely imprisoned him.  Id. at ¶ 39.

Pending before the court are Cossette and Midstate's Motions for Summary Judgment (Doc. Nos. 132, 135).

## II.     STATEMENT OF FACTS

On the evening of January 22, 2011, Byrans was celebrating his thirtieth birthday.  Bryans' Local Rule (L.R.) 56(a)(2) Stat. (Cossette) ¶ 1.  He had dinner at Maloney's Pub in Meriden at approximately 6:00 p.m. with his then girlfriend (now wife) Courtney (Larson) Bryans ("Mrs. Bryans"), his sister Deborah Bryans, and approximately twenty-one others.  Id. at ¶ 2.

1

While at Maloney's Pub, Byrans consumed two draught beers.  Id. at ¶ 4.  At approximately 7:30 p.m., the group, bringing along beer and champagne, boarded a Premier Limo party bus, which was to take them to a pub in Springfield, Massachusetts. Id. at ¶¶ 4-6.  On the bus to Springfield, Bryans consumed two cans of beer.  Id. at ¶ 7. At the pub, Bryans consumed two draught beers.  Id. at ¶ 8.  According to Cossette, Bryans also had at least one shot of hard alcohol.  Cossette's L.R. 56(a)(1) Stat. ¶ 8. However, Bryans denies that he took a shot.  Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 8.

The group left the bar in Springfield, boarded the party bus, and drove to a bar called Up On The Rocks in Hartford, Connecticut.  Id. at ¶ 9.  Bryans consumed one can of beer on the bus to Hartford and one Coors Light beer at Up On The Rocks.  Id. at ¶¶ 9-10.  Bryans denies that he had any hard alcohol; however, his sister—who was sober that evening—says she saw him take a whip cream shot and consume a small chug of champagne.  Id. at ¶ 11.  Bryans admits that he was not sober that evening.  Id. at ¶ 12.

The group left Up On The Rocks to go back to Maroney's Pub.  Id. at ¶ 13. During that ride on the party bus, at around 1:00 a.m., Bryans cut his left thumb on broken glass and was bleeding heavily.  Id.  at  ¶¶ 1, 13-14.  Bryans claims that he stood up on the bus to change seats and, when he put his hand down to stabilize himself, he cut his thumb.  Id. at ¶ 13.  Bryans and his wife decided to have the party bus drive them to Midstate to have his thumb looked at.  Id. at ¶ 14.  Jason Ramos, the driver of the party bus, recalls that Byrans was "pretty intoxicated" and not "really with it," and that, when he exited the bus, he was "swaying back and forth" and he did not seem able

to walk to the emergency room himself.  Id. at ¶¶ 15-16.  However, according to Bryans, a video depicts Bryans walking with a steady gait and without staggering.  Id.

Bryans arrived at Midstate at 1:26 a.m.  Bryans' L.R. 56(a)(2) Stat. (Midstate) ¶ 17.  When Bryans arrived at Midstate, he checked in to the emergency department, was immediately brought to a private room, and a nurse came to redress his hand.  Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 17; Bryans' L.R. 56(a)(2) Stat. (Midstate) ¶ 19.  Colleen Clark, the Midstate Nurse who triaged Bryans, entered a notation of "ETOH" on Bryans' assessment form.  Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 79.  "ETOH" indicates that, "there is some kind of alcohol on board."  Id; Bryans' L.R. 56(a)(2) Stat. (Midstate) ¶ 19. According to Bryans, this notation was not based on a BAC.  Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 79.

Bryans claims that he then waited in the emergency room for approximately one hour, after which Mrs. Bryans left the room to find someone to assist him.  Id. at ¶ 18; Bryans' L.R. 56(a)(2) Stat. (Midstate) ¶ 23.  After Mrs. Bryans left, Bryans claims he decided to go outside for a cigarette.  He did not tell any hospital employee where he was going and, although he did not know his way around the hospital, he did not ask for directions as to where to smoke.  Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 19.  Bryans claims that he turned left out of his room, then turned right, and walked down a hallway toward glass sliding doors, which he believed were the hospital exit.  Id. at ¶ 20.  The sliding glass doors were actually the ambulance bay doors, and they lock behind an individual who walks through them from inside the hospital.  Id. at ¶ 26.  Only individuals with an access code can open the ambulance bay doors.  Id.

Dianne Bafuma ("Nurse Bafuma"), a Midstate Nursing Coordinator on duty that night, saw Bryans walking toward the sliding glass doors at approximately 2:25 a.m.. Id. at ¶ 21; Bryans' L.R. 56(a)(2) Stat. (Midstate) ¶ 29.  She called out to him, "hey buddy, you can't go out through those doors," or something to that effect.  Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 21.  As Bryans was exiting the building, Nurse Bafuma attempted to direct Bryans back into the hospital by grabbing the back of his t-shirt.  Id. at ¶ 22; Bryans' L.R. 56(a)(2) Stat. (Midstate) ¶ 34.  However, although Bryans looked toward Nurse Bafuma, he did not respond and continued to walk outside.  Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 23.  When Bryans turned around toward Nurse Bafuma, she observed that his eyes were glazed, and she smelled a strong odor of alcohol.  Bryans' L.R. 56(a)(2) Stat. (Midstate) ¶ 36.  Nurse Bafuma testified that Bryans had a stilted gait.  Bryans' L.R. 56(a)(2) Stat. (Midstate) ¶ 30; Cossette's L.R. 56(a)(1) Stat. ¶ 28. According to Bryans, he was not walking with a stiled gait, as seen on the video. Bryans' Mem. in Opp. Mot. Summ. J., Ex. 19.

At this time, it was approximately 6 degrees Fahrenheit outside.  Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 24.  Bryans was not wearing a jacket and only had on a short-sleeved t-shirt.  Id.  Nurse Bafuma was concerned for Bryans' safety and well-being, given the weather and his attire.  Id. at ¶ 25.  She knew there was still snow on the premises and understood that there could be ice on the pavement.  Bryans' L.R. 56(a)(2) Stat. (Midstate) ¶ 44.  It was her impression, based on her observation of Bryans, that he did not appreciate his poor judgment in departing Midstate.  Id. at ¶ 45. She also knew that the only external doors open to the public were those outside the emergency department, which were on the opposite side of the building.  Id. at ¶ 46.

4

Nurse Bafuma spoke with Sean Raimo ("Raimo"), the Midstate Nursing Supervisor on duty.  Id. at ¶ 50.  Raimo contacted Midstate security to request that they go to the rear parking lot and return Bryans to the emergency department.  Id. at ¶ 51; Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 31.  At the time Bryans left through the ambulance bay doors, Meriden police officers Cossette and Mark Nowak ("Nowak") were at Midstate on an unrelated matter.  Id. at ¶ 29.  Cossette and Nowak overheard Raimo when he received the message regarding Bryans and asked if Raimo needed assistance.  Bryans' L.R. 56(a)(2) Stat. (Midstate) ¶ 52.  Raimo informed them that Byrans was an intoxicated individual who had left the facility without being released and told the officers that he had sent for security.  Id; Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 29.  He told the officers that he did not know how long it would take security to arrive and that, if Bryans made it off the property, Raimo would call for police.  Bryans' L.R. 56(a)(2) Stat. (Midstate) ¶ 52.  According to Cossette, Midstate staff requested Cossette and Nowak's assistance in bringing Bryans back to the hospital.  Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶¶ 29-30.

Bryans had exited through the ambulance bay doors and began walking through the back parking lot.  Id. at ¶ 32.  According to Bryans, because there were "no smoking" signs posted at Midstate, he planned to walk to the far end of the parking lot to smoke and then return to have his thumb treated.  Bryans' L.R. 56(a)(2) Stat. (Cossette) p. 5 ¶ 3.  Cossette and Nowak exited through the ambulance bay doors and observed Bryans approximately 150 yards away in the parking lot.  Id. at ¶ 33.  Bryans was heading in the direction of the State Police Complex.  Id.

Phil Costanzo ("Costanzo"), a Midstate Security Officer on duty, responded to a page for Midstate security to report to the ambulance bay.  Bryans' L.R. 56(a)(2) Stat. (Midstate) ¶ 53.  When he arrived, he did not see Bryans and was told to go outside and bring Bryans back to the hospital.  Id.  Corey Wilson ("Wilson"), another Midstate Security Officer, arrived at the ambulance bay at approximately the same time as Costanzo.  Id. at ¶ 54.  He accompanied Costanzo outside and headed toward the parking lot behind the hospital building.  Id; Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 34.

Officers Cossette and Nowak yelled at Byrans to stop, but Bryans kept walking through the parking lot, away from the hospital.  Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 35.  According to Bryans, he did not hear Cossette and Nowak.  Id.  Nowak continued to pursue Byrans on foot and yell at him to stop.  Id. at ¶ 36.  However, according to Bryans, he still did not hear him.  Id.  Cossette drove toward Bryans in his police cruiser.  Id.  Cossette and Nowak caught up to Bryans before Costanzo and Wilson could get to him.  Bryans' L.R. 56(a)(2) Stat. (Midstate) ¶ 55.  Once Cossette and Nowak began to interact with Bryans, Costanzo and Wilson understood that this was a police matter in which they would not get involved.  Id. at ¶ 56.  They stopped a distance away from where Cossette, Nowak, and Bryans were located.  Id.

According to Cossette, he and Nowak gave Bryans several verbal commands to stop, but Bryans did not stop.  Cossette's L.R. 56(a)(1) Stat. ¶ 37.  According to Bryans, Cossette gave a few commands, but not as many as he claims.  Bryans' Aff. ¶ 15.  For example, according to Bryans, just before getting out of his police cruiser, Cossette said something to the effect of, "stay right there."  Bryans' L.R. 56(a)(2) Stat. (Cossette) p. 7 ¶ 14.  Cossette stopped his police cruiser in front of Bryans, exited the car, and

attempted to grab Bryans' right wrist to prevent him from leaving.[1]  Cossette's L.R. 56(a)(1) Stat. ¶ 38.

Bryans spun around in a 360 degree circle and freed his arm from Cossette's grasp.  Id. at ¶ 39.  Nowak took Bryans' left wrist while Cossette attempted to restrain Bryans' right wrist.  Id. at ¶ 41.  Bryans asked Cossette what he was doing, and Cossette instructed him to "stop resisting."[2]  Id. at ¶ 40.  According to Cossette, he and Nowak issued numerous commands for Bryans to relax and calm down and they advised him that there was no need to fight.  Cossette's L.R. 56(a)(1) Stat. ¶ 42. According to Cossette, Bryans continued to fight with the officers and they brought him to the ground to gain better control of him.  Id. at ¶ 43.  According to Bryans, he was not fighting with the officers.  Bryans' L.R. 56(a)(2) Stat. ¶ 43; see also Bryans Dep. at 73:15-16 (stating that, once the officers both grabbed his wrists, they immediately threw him to the ground).

As Bryans was taken to the ground, he was able to pull his left arm out of Nowak's grasp to brace himself so his face and head did not strike the ground.  Bryans'

---

[1] Bryans denies this assertion by relying on his Affidavit, in which he states that, "[w]hen I kept walking, he then grabbed me by the wrist, said 'put your hands behind your back,' or words to that effect, and immediately tackled me and threw me down face first onto the asphalt.  Bryans Aff. ¶ 17.  However, in his deposition, Bryans testified that Cossette got out of his police cruiser; he grabbed Bryans' right wrist and tried to handcuff him; Bryans spun around and asked him what he was doing; Cossette said "stop resisting;" Nowak came and grabbed his left wrist; and then they took him down to the ground. Bryans' Dep. at 71-72.  Therefore, the court concludes that the statement from Cossette—that he stopped his police cruiser in front of Bryans, exited the car, and attempted to grab Bryans' right wrist to prevent him from leaving—is admitted.  See Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.").

[2] Bryans claims in his Local Rule 56(a)(2) Statement that he was already on the ground when Cossette told him to stop resisting.  Bryans' L.R. 56(a)(2) Stat ¶ 40.  However, in his deposition, Bryans stated that Cossette grabbed him by the right arm and told him to stop resisting, after which Bryans spun around on him.  Bryans' Dep. at 72:11-16.  Therefore, the court deems this statement admitted.  See Mack, 814 F.2d at 124.

L.R. 56(a)(2) Stat. ¶ 44.  Once Bryans was on the ground, he resisted and struggled with the officers as they tried to handcuff him.[3]  Cossette's L.R. 56(a)(1) Stat. ¶ 45. Bryans hesitated and asked the officers why he was being arrested.[4]  Id. at ¶¶ 46-47.

According to Cossette, Bryans was leaning on his right shoulder and attempting to push up with his left arm.  Id. at ¶ 50.  Nowak repeatedly gave Bryans verbal commands to lie down flat on the ground.  Id. at ¶ 51.  According to Bryans, he was not pushing up with his arm, but rather attempting to keep his face from hitting the ground.[5] Bryans Dep. at 105:12-25.

The parties agree that Cossette delivered several closed fist strikes to Bryans' right side torso.  Id. at ¶ 52.  According to Cossette, Bryans continued to actively resist, Cossette's L.R. 56(a)(1) Stat. ¶ 53, which Bryans denies, Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 53.  Cossette then deployed his department-issued X-26 Taser in a drive stun capacity into Bryans' upper right back.  Id.

According to Cossette, Bryans then complied with the officers' commands by lying flat on the ground and putting his hands behind his back.  Cossette's L.R. 56(a)(1) Stat. ¶ 54.  According to Bryans, he was handcuffed after Cossette punched his torso.

_____

[3] Again, Bryans denies this assertion by referencing his Affidavit, in which he claims that, "[t]he police caught me completely by surprise, and after being beaten in the ribs while on the ground I immediately offered my left hand to be cuffed."  Bryans Aff. ¶ 20.  However, in his deposition, Bryans did not deny resisting the officers' efforts to get him into handcuffs once on the ground.  Bryans Dep. at 76:4-14.  Bryans admitted that he resisted the officers by being hesitant.  Id. at 76:15-18. Further, he said he did not deny that, while on the ground, there was a struggle between him and the officers.  Id. at 78:1-6.

[4] Bryans admitted in his deposition that he hesitated and asked the officers why he was being arrested.  Bryans Dep. at 76:15-23.

[5] Bryans denies in his Local Rule 56(a)(2) Statement that he was attempting to push up with his left arm.  Bryans L.R. 56(a)(2) Stat. ¶ 50.  He cites to his Affidavit, in which he says he was tackled to the ground, Cossette beat him in the ribs, and he immediately offered his left hand to be cuffed.  Bryans Aff. ¶¶ 17-20.  However, in his deposition, he speaks specifically to the defendant's assertion that he was attempting to push up with his left arm, instead saying that he was trying to keep his face from hitting the ground.  Bryans Dep. at 105:12-25.

Bryans Aff. ¶ 17.  Bryans alleges that, after he was handcuffed, Cossette proceeded to tase him several times in drive stun mode.  Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 55. Midstate Security Officer Costanzo, who witnessed the incident, testified that there was no break in time—between Bryans being brought to the ground and the officers getting him under control—where Bryans could have been handcuffed.  Id. at ¶ 56.

The parties agree that Cossette and Nowak helped Bryans up and walked him back into the hospital.  Id. at ¶ 58.  While the officers were walking back, Bryans yelled loudly, "take off the handcuffs so I can fuck you up!  I can take you!"  Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 59.  Bryans also yelled random slurs and slanders.  Id. According to Bryans, he does not believe his speech was slurred.  Bryans' L.R. 56(a)(2) Stat. (Cossette) p. 6 ¶ 11.  Midstate Security Officers Costanzo and Wilson followed Cossette and Nowak back into the hospital as they escorted Bryans.  Bryans' L.R. 56(a)(2) Stat. (Midstate) ¶ 59.  Bryans did not complain, at this time, of any injuries other than his thumb.[6]  Cossette's L.R. 56(a)(1) Stat. ¶ 57.

Cossette and Nowak walked Bryans back to the room to which he had been assigned earlier.  Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 60.  They handcuffed Bryans to the hospital bed.  Id. at ¶ 61.  Bryans continued to scream in the hospital for at least 25 minutes, id. at ¶ 62; however, while Cossette says he screamed profanities,

---

[6] Cossette cites to his police report for support for this assertion.  In the report, when discussing the incident—and before discussing walking Bryans back to the hospital—Cossette wrote that, "Joseph did not complain of any injury further than his initial reason for treatment."  Cossette's Mem. in Supp. Mot. Summ. J., Ex. G., at 3.  Bryans denies this assertion by citing to his Affidavit, in which he discusses complaining about how tight his handcuffs were when he was in his hospital room.  Bryans Aff. ¶ 25-28. Therefore, it appears that both parties admit that, prior to Bryans' complaints about his handcuffs, he did not complain about any other injuries besides his left thumb (the injury that caused him to go to the hospital in the first place).  See also Bryans Dep. at 107:3-6 (discussing Cossette's police report and stating that Bryans agrees that he did not complain of any injury further than his initial reason for treatment).

Cossette's L.R. 56(a)(1) Stat. ¶ 62, Bryans denies this, Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 62.  According to Cossette, Bryans asked Cossette to loosen his handcuffs and Cossette complied.  Cossette's L.R. 56(a)(1) Stat. ¶ 63.  According to Bryans, he repeatedly asked Cossette to loosen the cuffs because his wrists were turning blue; however, Cossette ignored Bryans.  Bryans' L.R. 56(a)(2) Stat. (Cossette) p. 8 ¶ 24. According to Bryans, after he complained loud enough for the nurse to hear, the nurse told Cossette that he had to loosen the cuffs because they were too tight.  Id. at p.8 ¶¶ 25-26.  Cossette then loosened the handcuffs.  Id. at p.10 ¶ 45.  The physician noted on the template form that Bryans had "ETOH intoxication."  Id. at ¶ 80.

After being treated for the cut on his thumb, Cossette transported Bryans to Meriden Police headquarters.  Id. at ¶¶ 64-65.  On the way, Bryans unsuccessfully tried to pull his handcuffs underneath his legs and became stuck in an awkward position with his hands between his legs.  Id. at ¶ 65.  At the Meridan Police headquarters, Bryans was placed in a holding cell until he was later processed by Nowak, who removed his handcuffs.  Id. at ¶ 66.

According to Bryans, from the incident, he suffered bruises to his right back and rib area, six taser burns/scars, a large scratch/gash down the center of his back, numbness in his left hand/wrist lasting for approximately three months, and miscellaneous cuts and bruises on his hips and legs.  Bryans' Mem. in Opp. Mot. Summ. J., Ex. 7, ¶ 5.  Bryans never sought medical treatment for the alleged numbness in his left wrist, which he claims was caused by the handcuffs.  Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 68.  Eventually, the numbness went away.  Id.

As of February 10, 2012, Bryans had been letting all of his injuries heal naturally. Bryans' Mem. in Opp. Mot. Summ. J., Ex. 7, ¶ 5.  On December 3, 2012, Bryans went to see Alan Schwarz, MD, complaining of lower back pain, which he had had for a long time.  Bryans' Mem. in Opp. Mot. Summ. J., Ex. 17, at 9.  Dr. Schwarz noted that Bryans had a "normal gait and muscle strength and tone" with full range of motion.  Id. He assessed Bryans as having a lumbar strain.  Id. at 10.  His MRI showed a "mild broad-based posterior annular disc bulge with associated punctate annular fissure at L5-S1 without significant central canal stenosis."  Id. at 19.  According to Edward Akeyson, MD, who also treated Bryans, as of January 18, 2013, Bryans "had no directed treatment for this problem."  Bryans' Mem. in Opp. Mot. Summ. J., Ex. 18, at 20.  Dr. Akeyson recommended "slightly stronger anti-inflammatories and muscle relaxants as well as a directed course of physical therapy."  Id.  According to Dr. Akeyson, "it is unlikely that he will need surgery in the foreseeable future."  Id.

## III.   STANDARD OF REVIEW

### A.  Motion for Summary Judgment

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  Id.  In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

B. Motion to Preclude

Pursuant to the Rules of Evidence, expert testimony is properly admitted where it "will assist the trier of fact to understand the evidence or determine a fact in issue," and "(1) is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. It is up to the court to ensure that an expert's testimony "rests on both a reliable foundation and is relevant to the task at hand." See Daubert v. Merrell Dow Pharms., 509 U.S. 579, 597 (1993). Generally, courts should consider: (1) whether the theory or technique upon which the expert relies can be tested; (2) whether the theory or technique has been subject to peer review and

12

publication; (3) the known or potential rate of error; (4) the existence and maintenance

of standards controlling the technique's operation; and (5) whether the theory or

technique has been widely accepted by the relevant scientific community.  See id. at

593–94; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 148 (1999) (applying

Daubert factors to all expert testimony).  The party proffering the expert testimony bears

the burden of demonstrating its admissibility by a preponderance of the evidence.  See

Daubert, 509 U.S. at 592, n.10.

## IV.   DISCUSSION

### A.   Motions for Summary Judgment

Cossette moves for summary judgment as to Bryans' sections 1983 claim, based

on the Cossette's alleged unreasonable use of force[7] and deliberate indifference to

Bryans' serious medical needs.  Midstate moves for summary judgment as to Bryans'

state law claim for false imprisonment.

### 1.   Section 1983 claim

In order to demonstrate a violation of section 1983, a plaintiff must prove that: (1)

the defendants acted under color of state law, and (2) the defendants' conduct deprived

the plaintiff of a constitutional or federal statutory right.  See e.g., Gladwin v. Pozzi, 403

Fed. Appx. 603, 605 (2d Cir. 2010).  Bryans alleges that Cossette violated his Fourth

---

[7] At points in his Opposition, Bryans appears to argue that Cossette did not have a basis to stop him.  See  Bryans' Mem. in Opp. Cossette's Mot. Summ. J. at 15 ("The plaintiff had not committed any crimes and it is my opinion that the arrest itself was not based upon probable cause"); see also Bryans' Suppl. Mem. in Opp. Cossette's Mot. Summ. J. (Doc. No. 170) (describing D'Addio v. Maldonado, 2006 WL 533790 (D. Conn. Mar. 2, 2006), in which the court denied summary judgment because there were disputes of fact with regard to plaintiff's claims that the defendant performed a warrantless arrest or impermissible Terry stop).  Bryans did not allege in his Third Amended Complaint a claim based on false arrest or unreasonable seizure.  Therefore, the court does not consider this argument.

and Fourteenth Amendment rights by subjecting him to excessive force and being deliberately indifferent to his serious medical needs.

a. Excessive force

Neither party argues as to whether Cossette was acting under color of state law at the time of his interaction with Bryans.  As it is undisputed that Cossette was on duty as a police officer at the time of the incident, this prong of Bryans' section 1983 claim is not at issue.  Therefore, the court will only consider whether there are material disputes of fact, which would allow a reasonable jury to conclude that Cossette's conduct deprived Bryans of a constitutional or federal statutory right.

It is well established that the Fourth Amendment protects an individual's right to be free from the use of excessive force.  See Graham v. Connor, 490 U.S. 386, 396–97 (1989).  In determining whether a particular use of force was excessive, courts consider the use of force from the perspective of a reasonable officer on the scene, paying particular attention to the facts and circumstances of the particular case, including the severity of the crime, whether the suspect poses an immediate threat to safety, and whether the suspect is attempting to resist arrest or flee.  See id. at 396.

Cossette argues that Bryans cannot sustain his claim of excessive force because Cossette's actions were reasonable in light of the circumstances, particularly the fact that Bryans did not respond to the officers' commands to stop and he resisted arrest. Cossette's Mem. in Supp. Mot. Summ. J. at 17-18.  Bryans argues that, because Bryans was free to leave the hospital, Cossette acted unreasonably by punching and tasing him.  Bryans' Mem. in Opp. Cossette's Mot. Summ. J. at 15.

Cossette cites to cases in which courts have granted summary judgment to defendants who used force while making an arrest.  In Massaro v. Town of Trumbull, 525 F.Supp.2d 302, 308 (D. Conn. 2007), the court stated that pushing the plaintiff— who was a known convicted felon—to the ground while executing an arrest warrant did not necessarily qualify as excessive force.  Id. (concluding that summary judgment was appropriate because, even if the push constituted excessive force, the officers were entitled to qualified immunity).  In Wysong v. City of Heath, 260 Fed. Appx. 848, 854 (6th Cir. 2008), the Sixth Circuit held that, if the plaintiff was resisting arrest, the officers did not use excessive force when they struck the plaintiff's leg with their open hands and placed a knee on the plaintiff's back to subdue him.

In this case, there are disputes of fact which prevent the court from determining on summary judgment whether Cossette's conduct constituted excessive force as a matter of law.  According to Cossette, Bryans resisted arrest—he spun around 360 degrees when Cossette grabbed his arm; he would not put his hands behind his back after Cossette and Nowak brought him to the ground; and he continued to ignore commands after Cossette hit him with closed fists.  See Wysong, 260 Fed. Appx. at 854 (stating that Sixth Circuit cases "show that the police may use force on suspects who resist arrest in the manner in which Wysong resisted [by flailing and kicking]).  Taking Cossette's version of events—that he tased Bryans after his previous attempts to subdue and handcuff him were unsuccessful—the court finds it unlikely that Bryans could succeed on his excessive force claim.  See Crowell v. Kirkpatrick, 667 F.Supp.2d 391, 407-08 (D. Vt. 2009) (stating that plaintiffs were resisting arrest and took steps beyond mere noncompliance with orders, and that defendants gradually progressed

15

through varying degrees of lesser force before deciding to use their tasers; therefore, use of the taser did not constitute excessive force).

However, according to Bryans, he was <u>already</u> handcuffed when Cossette tased him.[8]  Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 53.  If the jury were to credit Bryans' testimony, it could conclude that it was unreasonable for Cossette to tase Bryans while he was handcuffed and subdued.  See <u>Austin v. Redford Tp. Police Dept.</u>, 690 F.3d 490, 496-97 (6th Cir. 2012) (affirming district court's decision that there was a dispute of fact as to whether the defendants violated the plaintiff's rights because there was evidence that the plaintiff "posed no significant threat to the officers once he was on the ground" and that the use of force against a subdued suspect was unreasonable); <u>see also</u> <u>Orell v. Muckle</u>, 2012 WL 3231017, at * (D. Conn. Aug. 6, 2012) (stating that a jury could conclude that the plaintiff was not actively resisting prior to use of the taser and that, therefore, use of the taser was unreasonable); <u>Nelson v. City of Stamford</u>, 2012 WL 233994, at *5-6 (D. Conn. Jan. 25, 2012) (finding a dispute of material fact because, "[w]hereas Mr. Nelson alleges that he was merely passively resisting arrest when a Taser was applied to his body, the Defendants report that Mr. Nelson was actively struggling to avoid being placed in handcuffs and ignored repeated instructions to place his arms behind his back in order to avoid being subjected to a Taser").  Furthermore,

---

[8] Defense Expert Sergeant Minor concluded that, if Bryans' hands were restrained behind his back in handcuffs while he was tased, there would have been bruises and drive stun signature marks on his arms and back.  Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 73.  Because Bryans did not introduce any evidence of injuries to his arms, Minor concluded that Bryans must not have been tased while handcuffed.  <u>Id.</u>  Although Minor's expert testimony would suggest that Bryans' testimony is not credible, it is for the jury to evaluate the expert's testimony.  See <u>Brown v. County of Nassau</u>, 736 F. Supp. 2d 602, 620 (E.D.N.Y. 2010) (stating that, "even if a plaintiff offers expert testimony on a claim and the defendant does not have its own expert, the defendant is still generally entitled to overcome a summary judgment motion by a plaintiff and require plaintiff to have the factfinder evaluate the expert testimony to determine whether the plaintiff has met his or her burden").

the parties disagree as to whether, while on the ground, Bryans was leaning on his right shoulder and attempting to push up with his left arm, Cossette's L.R. 56(a)(1) Stat. at ¶ 50, or whether Bryans was merely attempting to brace his fall, Bryans Dep. at 105:12-25.  If the jury were to find Cossette's description of events credible, Bryans' resistance—in the form of pushing his body up off the ground—may justify Cossette's use of force.  See Crowell v. Kirkpatrick, 667 F.Supp.2d at 407-08.  However, if Bryans was merely trying to protect his head from hitting the asphalt—and Cossette could have and should have known this—a jury could determine that Cossette's closed fist punches were unreasonable.[9]

   b.  Qualified immunity

Cossette argues that, even if he is not entitled to summary judgment because a reasonable jury could determine that he used excessive force, he is nonetheless entitled to summary judgment based on qualified immunity.  Cossette's Mem. in Supp. Mot. Summ. J. at 28.  Police officers are entitled to judgment in their favor on constitutional claims if they did not violate clearly established rights about which a reasonable officer would have known.  Jones v. Parmley, 465 F.3d 46, 55 (2d Cir.2006); Maye v. Vargas, 638 F.Supp.2d 256, 261–62 (D.Conn.2009).  "As to the 'clearly established' prong of this analysis, '[t]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official

---

[9] Bryans has introduced a video depicting the altercation in the parking lot.  Bryans' Mem. in Opp. Cossette's Mot. Summ. J., Ex. 19.  The video shows a very fast exchange between Bryans and the officers, which could suggest to a jury that there was not enough time for Bryans to have resisted in the manner that Cossette describes.  However, it is for the jury to determine, based on the testimony and the video, what credibly happened in the parking lot.

would understand that what he is doing violates that right." Huertas v. Ivanko, 2013 WL 1193187, at *15 (D. Conn. Mar. 23, 2013). "[T]he issue is whether it was objectively reasonable for the officers to believe that their particular actions did not violate Plaintiff's right to be free from excessive use of force." Id.

"Although qualified immunity is a question of law, because issue of reasonableness depends on the facts of the situation, if there is a dispute as to the facts, that must be resolved by the factfinder before qualified immunity can be granted." Maye, 638 F.Supp.2d at 262 (citing Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir.2007)). The disputed facts that make summary judgment on excessive force inappropriate also preclude summary judgment on qualified immunity. See Nelson, 2012 WL 233994, at *8 (denying summary judgment based on defendants' qualified immunity defense because there were "genuine issues of material fact in dispute in all three alleged instances of excessive force [including use of a taser] that directly bear on the Court's analysis regarding the reasonableness of the Defendants use of force"). Therefore, Cossette's Motion for Summary Judgment as to Bryans' section 1983 claim based on excessive force is denied.[10]

c.  Deliberate indifference to serious medical needs

Cossette argues that Bryans has not introduced evidence that would allow a reasonable jury to conclude that Cossette was deliberately indifferent to his serious medical needs. Cossette's Mem. in Supp. Mot. Summ. J. at 24. The Second Circuit

---

[10] Cossette appears to also argue that Bryans did not suffer a significant enough injury to have been subjected to excessive force. See Cossette's Reply (Doc. No. 175) at 5 (stating that, "plaintiff does not, in any substantive manner at least, dispute that he left the encounter with Officers Cossette and Nowak no worse than when he entered it"). However, excessive force "case law focuses on whether the force used was de minimis, rather than whether the alleged injury was de minimis." Sharnick v. D'Archangelo, 2013 WL 1276051, at * 9, __ F. Supp. 2d __ (D. Conn. 2013).

has held that it applies "the Eighth Amendment deliberate indifference test to pretrial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment." Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000). According to the Cuoco court, Bryans' claim for deliberate indifference survives if he introduces evidence that the "defendants denied [him] . . ., an unconvicted detainee, 'treatment needed to remedy a serious medical condition and did so because of [their] deliberate indifference to that need.'" Id. (quoting Wyent v. Okst, 101 F.3d 845, 856 (2d Cir. 1996). "[I]n order to establish deliberate indifference, a plaintiff must show 'something more than mere negligence,' but proof of intent is not required, for the deliberate-indifference standard 'is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" Wyent, 101 F.3d at 856.

Cossette argues that Bryans has not introduced evidence that he suffered from a serious medical condition. Cossette's Mem. in Supp. Mot. Summ. J. at 26. Although Bryans failed to respond to Cossette's argument with regard to his claim for deliberate indifference, see Bryans' Mem. in Opp. Cossette's Mot. Summ. J. at 22-25, it appears that Bryans claims that Cossette was deliberately indifferent with regard to two categories of injuries: (1) the injuries sustained as a result of his handcuffs being too tight while in the hospital room, and (2) the injuries sustained as a result of the altercation in the parking lot.

Cossette argues that Bryans has not introduced evidence that any of these injuries were a serious medical condition. Cossette's Mem. in Supp. Mot. Summ. J. at 26. Under the Eighth Amendment deliberate indifference standard, "[i]t is well established that more than minor discomfort or injury is required in order for a plaintiff to

demonstrate a serious medical need." Evering v. Rielly, 2001 WL 1150318 , at *9 (S.D.N.Y. 2001). "Deliberate indifference requires injuries that demonstrate urgency leading to death, degeneration or extreme pain." Id.

As for the numbness in Bryans' wrists from the handcuffs, very tight handcuffs, which lead to bleeding and abrasions, do not constitute a serious medical need because they could not produce death, degeneration, or extreme pain. Mikulec v. Town of Cheektowaga, 909 F. Supp. 2d 214, 223 (W.D.N.Y. 2012); Ruffino v. Gomez (D. Conn. Nov. 8, 2006) (citing Wesson v. Oglesby, 910 F.2d 278, 284 (5th Cir. 1990) (stating inmate's swollen, bleeding wrists from handcuffs that were too tight did not constitute a serious medical need); see also Perez v. City of New York, 2009 WL 1616374, at *9 (S.D.N.Y. June 8, 2009) ("Although the use of excessively tight handcuffs can constitute a violation of the Eighth Amendment . . . it appears highly unlikely that . . . pain in [the plaintiff's] wrists and pain, numbness and swelling in his foot and ankle, would be considered sufficiently serious [,in the absence of evidence the plaintiff suffered any lasting injury from the restraints,] to rise to the level of an Eighth Amendment violation") (internal citations omitted).

In Davidson v. Flynn, 32 F.3d 27, 29, 31 (2d Cir. 1994), the Second Circuit held that, on a motion to dismiss, the plaintiff had alleged a serious medical need by claiming that prison officials placed restraints on him "too tightly," which led to severe pain and permanent injury, including cuts, reduced circulation, swelling, scars, and numbness. Unlike the allegations set forth in Davidson, Bryans has not provided evidence of permanent injury as a result of the tight handcuffs. He said he suffered from numbness in his left hand/wrist lasting for approximately three months, Bryans' Mem. in Opp.

Cossette's Mot. Summ. J., Ex. 7, ¶ 5, but that he never sought medical treatment for the numbness, and it eventually went away.  Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 68. This evidence, taken in a light most favorable to the plaintiff, does not support a finding of a serious medical need.  See Majette v. Geo Group, Inc., 2010 WL 3743364, at *7 (E.D. Va. Sept. 22, 2010) (stating that plaintiff failed to introduce evidence of a serious medical need because there was no indication that he sought medical attention for his wrists).

However, even were the court to determine that there was evidence that would allow a reasonable jury to conclude that Bryans suffered from a serious medical need, Bryans has not introduced evidence that Cossette denied him treatment because of his deliberate indifference.  "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  Cuoco, 222 F.3d at 106 (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).

According to Bryans, he complained about his handcuffs while in his hospital room.  Although, at first, Cossette would not loosen them, he ultimately did.  Bryans' L.R. 56(a)(2) Stat. (Cossette) p. 8 ¶¶ 24-26, p. 10 ¶ 45.  The evidence shows that Bryans could not have been asking for his handcuffs to be loosened for a significant amount of time.  Bryans left the hospital through the ambulance doors at approximately 2:25 a.m.  Bryans' L.R. 56(a)(2) Stat. (Cossette) ¶ 24.  His chart shows that he was examined by a physician—after the altercation—around 3:00 a.m.  Cossette's Mem. in Supp. Mot. Summ. J., Ex. P.  Therefore, Bryans could not have been requesting

assistance with regard to his handcuffs for more than half an hour.  See also Bryans'
L.R. 56(a)(2) Stat. (Cossette) ¶ 62 (stating that Bryans was yelling in his hospital room
for 25 minutes).  Having loosened the handcuffs within 30 minutes, Cossette provided
prompt treatment under the second prong of the deliberate indifference test.  See
Stanley v. Meier, 2012 WL 2367386, at * 4(D. Conn. June 21, 2012) (stating that, even
if plaintiff had a serious medical need, the defendant was not deliberately indifferent
because he provided prompt treatment within 24 minutes); see also Reed v. Mortimer,
2012 WL 2502694, at *5 (S.D. Cal. Jan. 31, 2012) (stating that a "mere delay in
treatment does not constitute a violation of the Eighth Amendment, unless the delay or
denial was harmful" and dismissing the complaint because "it does not appear
Defendants' 10-hour delay in removing the handcuffs was harmful or resulted in
significant injury").[11]

The court next considers Bryans' injuries related to the incident in the parking lot.
Cossette argues that Bryans' injuries—bruises, taser burns, and back pain—do not
constitute a serious medical need.  Further, Cossette argues that no reasonable jury
could find him deliberately indifferent to Bryans' medical needs because, after the
incident, Cossette walked him back to the hospital where he was seen by a physician.
Cossette's Mem. in Supp. Mot. Summ. J. at 27.

Cossette's latter argument is dispositive; therefore, the court need not consider
whether Bryans' injuries constitute a serious medical need.  Bryans admitted in his
deposition that he did not complain to Cossette of any injury other than his initial reason
for seeking treatment at the hospital (his cut thumb).  Bryans Dep. at 107:3-6.

---

[11] To the extent that Bryans can introduce evidence that Cossette's disregard for the tightness of
Bryans' handcuffs constitutes excessive force, such evidence may support his excessive force claim.

Therefore, it cannot be said that Cossette knew of and disregarded an excessive risk to Bryans' health.   Cuoco, 222 F.3d at 106.  Further, Cossette immediately brought Bryans back to the hospital, where he was examined within 30 minutes.  Stanley, 2012 WL 2367386, at * 4 (granting summary judgment when plaintiff was provided prompt treatment); see also Cossette's Mem. in Supp. Mot. Summ. J., Ex. P (stating Bryans' received treatment at 3:00 a.m.).  Therefore, Cossette's Motion for Summary Judgment as to Bryans' section 1983 claim based on deliberate indifference is granted.

2.  False imprisonment

According to Midstate, it is entitled to summary judgment as to Bryans' false imprisonment claim because (1) Midstate's actions were lawful and Bryans has failed to introduce expert evidence to suggest otherwise, (2) Midstate employees did not restrain Bryans' physical liberty, and (3) Midstate's actions did not proximately cause any damage to Bryans.

Under Connecticut law, "[f]alse imprisonment is the unlawful restraint by one person of the physical liberty of another."  Rivera v. Double A Transportation, Inc., 248 Conn. 21, 31 (1999) (quoting Felix v. Hall-Brooke Sanitarium, 140 Conn. 496, 499 (1953)).  False imprisonment falls into the category of intentional torts.  Thus, in order for liability to be imposed, a person must purposively act to confine another or must act with the knowledge that the confinement is likely.  Green v. Donroe, 186 Conn. 265, 268 (1982).  Only extreme recklessness can replace the requirement of intention in a claim for false imprisonment.  Rivera, 248 Conn. at 32.

In addition to establishing intention or recklessness and actual confinement, a plaintiff must also prove that the restraint was against his will and that he did not

acquiesce to it willingly.  Lo Sacco v. Young, 20 Conn. App. 6, 19 (1989), cert. denied, 213 Conn. 808 (1989).  "Any period of restraint, no matter how brief in duration, is sufficient to constitute a basis for liability."  Pinnock v. City of New Haven 553 F.Supp.2d 130, 143 (D. Conn. 2008) (citing Green, 186 Conn. at 267).  However, the "detention must be wholly unlawful" for liability to result.  Id.

It appears that Bryans asserts two bases for his false imprisonment claim against Midstate: (1) Nurse Bafuma unlawfully restrained Bryans when she grabbed his t-shirt and attempted to prevent him from leaving through the ambulance bay doors, Bryans' Mem. in Opp. Midstate's Mot. Summ. J. (Doc. No. 168) at 22, and (2) Midstate "was wrong for telling the police to get Bryans" from the parking lot, id. at 4.  The court will consider each basis separately.

a.  Nurse Bafuma

Bryans argues that Midstate could not stop Bryans from leaving the hospital and that Nurse Bafuma's actions—following Bryans and physically laying her hand on him by "grabbing the back of his shirt in an apparent attempt to pull him back into the building," Bryans' Mem. in Opp. Midstate's Mot. Summ. J. at 22—constitute "unlawful restraint by the Midstate employee."  Id. at 23.  In response, Midstate argues that Bryans has failed to introduce evidence that Nurse Bafuma physically restrained Bryans.  Midstate's Reply (Doc. No. 178) at 5-7.  The court agrees.

As Midstate points out, Bryans admitted that, as he was walking through the ambulance bay doors, Nurse Bafuma, "asked me or she told me that I wasn't allowed to go outside . . . [and that he] acknowledged that she was talking to me, didn't say anything and continued outside."  Bryans Dep. at 198:17-24 (emphasis added).

24

According to Bryans, when he acknowledged Nurse Bafuma—by looking in her direction—she said, "sir, come back here." Id. at 199:5-8. When asked if anything else happened during that encounter, Bryans responded, "no." Id. at 199:12-16. It was Nurse Bafuma, not Bryans, who recalled that she pulled on Bryans' t-shirt with her thumb and forefinger after he had walked through the ambulance bay doors. Bafuma Dep. at 20:20-25-21:1-16. By all accounts, even with the pull on his shirt, Bryans continued walking out the doors and into the parking lot. Bryans' L.R. 56(a)(2) (Midstate) ¶ 39.

The undisputed evidence shows that Nurse Bafuma never physically restrained Bryans. Nurse Bafuma merely touched Bryans as he continued walking through the ambulance doors. First, Bryans did not recall Nurse Bafuma touching him, see Bryans Dep. at 198-199, suggesting he never felt physically restrained by her. Second, Bryans admits that he did not stop walking when Nurse Bafuma tried to stop him from leaving through the ambulance bay doors. He only looked in her direction. Id. at 199:5-8; see also Bryans' Mem. in Opp. Cossette's Mot. Summ. J., Ex. 19 (security video depicting Nurse Bafuma grabbing Bryans' shirt, Bryans stopping and turning to look at Nurse Bafuma, Nurse Bafuma letting go of Bryans shirt, Bryans continuing to walk outside, and Nurse Bafuma coming back inside the hospital). Therefore, no reasonably jury could find, based on the undisputed evidence, that Nurse Bafuma physically restrained Bryans. Because there was no period of restraint at the hands of Nurse Bafuma, there is no basis for liability for false imprisonment. See Green, 186 Conn. at 268 (stating that any period of restraint, however brief in duration, is sufficient to constitute a basis for liability).

       b.  Directing Midstate Security Officers and police to stop Bryans

Bryans appears to also argue that Midstate unlawfully restrained Bryans by sending police after him.

As a preliminary matter, Midstate argues that, to the extent that Bryans could argue that Midstate Security Officers Costanzo and Wilson falsely imprisoned Bryans, "the facts do not support an actionable claim of false imprisonment against MidState, because it was not MidState that physically restrained the plaintiff." Midstate's Mem. in Supp. Mot. Summ. J. (Doc. No. 136) at 20.

The undisputed facts are that Costanzo and Wilson were called to the ambulance bay doors by Midstate Nursing Supervisor Raimo; however, by the time they arrived, Bryans had already left the building. Bryans' L.R. 56(a)(2) Stat. (Midstate) ¶¶ 53-54. Cossette and Nowak reached Bryans before Costanzo and Wilson could and, because the exchange became a police matter, Costanzo and Wilson stopped a distance away and did not involve themselves in the altercation with Bryans. Id. at ¶¶ 55-56. Bryans admitted in his deposition that he did not know who Costanzo and Wilson were and never had any conversation with them. Bryans Dep. at 107:15-19. Because Costanzo and Wilson were not involved in restraining Bryans, their conduct cannot form the basis of a false imprisonment claim.

Next, as to whether "telling the police to get Bryans" from the parking lot, Bryans' Mem. in Opp. Midstate's Mot. Summ. J. at 4, could impose liability on Midstate, the court concludes that there are no facts in dispute that would allow a reasonable jury to find Midstate liable for any actions taken by Cossette and Nowak. Bryans admits that Officers Cossette and Nowak were within hearing distance of Nursing Supervisor Raimo

when Nurse Bafuma contacted Raimo about Bryans.  Bryans' L.R. 56(a)(2) Stat. (Midstate) ¶ 51.  It was after hearing Nurse Bafuma over the "open mic" that Cossette and Nowak asked Raimo if he needed their assistance.  Id. at ¶ 52.  Bryans does not argue that Raimo asked Cossette and Nowak to arrest Bryans.  Bryans admits in his Opposition to Midstate's Motion for Summary Judgment that Nursing Supervisor Raimo "never sent the police out to arrest Bryans but [instead said he would ask] for a safety check to assist security if Bryans went off the premises."[12]  Bryans' Mem. in Opp. Midstate's Mot. Summ. J. at 13.  Therefore, Bryans admits that Raimo never asked Officers Cossette or Nowak to stop Bryans in the Midstate parking lot.

Based on these undisputed facts, there is no evidence that would allow a reasonable jury to determine that Midstate played any role in Cossette and Nowak's altercation with Bryans.  To the extent that a jury could conclude that Bryans was physically restrained by Cossette and Nowak, no reasonable jury could determine that it was at the direction of, because of, or the intention of Midstate.[13]  See Green, 186 Conn. 265, 268 ("A person is not liable for false imprisonment unless his act is done for the purpose of imposing a confinement, or with knowledge that such confinement will, to a substantial certainty, result from it.").

---

[12] Neither party addresses the fact that, on the surveillance video, Nurse Bafuma is seen pointing out into the parking lot to men who appear to be police officers.  Bryans' Mem. in Opp. Cossette's Mot. Summ. J., Ex. 19.  However, without more, this evidence would not allow a reasonable jury to determine that Nurse Bafuma was telling the officers to seize Bryans nor is there any evidence that Nurse Bafuma intended for Cossette to confine Bryans.  Green, 186 Conn. at 268 ("A person is not liable for false imprisonment unless his act is done for the purpose of imposing a confinement, or with knowledge that such confinement will, to a substantial certainty, result from it.") (citing 32 Am.Jur.2d, False Imprisonment s 9; Restatement (Second), Torts s 35).

[13] Extreme recklessness can replace the requirement of intention in a claim for false imprisonment.  Rivera, 248 Conn. at 32.  However, Bryans has not provided any evidence, nor cited to any case law, to suggest that Raimo was reckless in discussing Bryans in the vicinity of Officers Cossette and Nowak.

For the reasons stated, as to all three bases for liability, <u>see</u> <u>supra</u>, p. 23, the court grants Midstate's Motion for Summary Judgment.

B.  <u>Motion to Preclude</u>

Cossette moves to preclude the testimony of Bryans' expert, Richard A. Siena, on the basis that: (1) he is not qualified with respect to the use of police tasers and, therefore, cannot offer an opinion on that issue; (2) his opinions lack proper foundation; and (3) he should be precluded based on a conflict of interest.  Cossette's Mot. to Preclude (Doc. No. 133) at 1.

The court can quickly resolve Cossette's first argument.  Siena admitted in his deposition that he is not qualified to render an opinion regarding Officer Cossette's use of the taser in this case: he said that his "experience with a Taser is very limited.  They were introduced to the profession probably within a year of—prior to my retirement."  <u>Id.</u>, Ex. B, at 91:6-8 (Siena's Dep.).  Therefore, to the extent that Siena was offering a specific opinion as to Cossette's use of the taser, it is precluded because Siena is not an expert in the use of tasers.  <u>See</u> <u>id.</u>, at 94:21-23 (responding that he does not consider himself to be an expert in tasers).

Cossette also seeks to preclude Siena's testimony that "any force that was used that day was improper," because, as Cossette used a taser, such a broad statement about "any" use of force inherently pertains to use of the taser.  Cossette's Mot. to Preclude at 5.  The court concludes that Siena's opinion—that "any force that was used that day was improper"—is inadmissible because it goes to the ultimate fact to be decided by the jury.  <u>See</u> <u>Roguz v. Walsh</u>, 2013 WL 1498126, at *10 (D. Conn. Apr. 5, 2013) (finding that an opinion that the force used "was objectively reasonable based on

the totality of the circumstances" was inadmissible) (citing <u>Hygh v. Jacobs</u>, 961 F.2d 359, 364 (2d Cir. 1992) (stating that opinions that "conduct was not 'justified under the circumstances,' not 'warranted under the circumstances,' and 'totally improper'" were "conclusory condemnations" that merely tell the jury what result to reach)).  To the extent that Siena's opinions—or defendant's expert's opinions, for that matter—are in the nature of conclusory, ultimate issue opinions—the court will not allow them into evidence.

However, to the extent that Siena offers other opinions—for example, that "[t]he defendant could have most likely handled this verbally, not physically," Bryans' Mem. in Opp. Mot. to Preclude, Ex. 2, at 9—the court concludes that those opinions are admissible under Rule 702.  Cossette argues that these opinions are not based on sufficient facts or data.  Cossette's Mot. to Preclude at 6.  However, the court disagrees. Siena lists the evidence on which he bases his opinion.  Although Cossette argues that Siena should have weighed other evidence in reaching his opinion, Siena's failure to do so does not make his opinion inadmissible.  Rather, that is a point on which Cossette may cross-examine Siena to impeach his testimony.

Lastly, the court finds Cossette's argument regarding a so-called conflict of interest unavailing.  The cases cited by Cossette are not on point and pertain to a party's right to examine documents reviewed by an expert, even when those documents were first reviewed when the expert served as a consultant in the case.  <u>See</u> <u>In re Air Crash at Dubrovnik, Croatia on April 3, 1996</u>, 2001 WL 777433, at *9 (D. Conn. June 4, 2001) (ordering turnover of documents because "there exists no clear distinction between the roles Godsey was playing when he created and/or reviewed them").  The

court sees no basis to <u>disqualify</u> Siena because he served as a consultant to Bryans before becoming an expert in the case.  Furthermore, the cases cited by Cossette authorize an opposing party to review <u>documentary evidence</u> reviewed by an expert at the time he served as a consultant, assuming that evidence was considered in the forming of his opinion.  <u>Id.</u>  The court sees no basis to require Siena to testify about his conversations with Bryans at the time he was serving as a consultant, as Cossette requests.

## V.    CONCLUSION

For the foregoing reasons, Midstate's Motion for Summary Judgment (Doc. No. 135) is **GRANTED**.  Cossette's Motion for Summary Judgment (Doc. No. 132) is **GRANTED** as to Bryans' claim, pursuant to section 1983, that Cossette was deliberately indifferent to his serious medical needs and **DENIED** as to Bryans' claim, pursuant to section 1983, for excessive force.  Cossette's Motion to Preclude (Doc. No. 133) is **GRANTED IN PART** and **DENIED IN PART**.

**SO ORDERED.**

Dated at New Haven, Connecticut this 30th day of August, 2013

<u>/s/ Janet C. Hall</u>
Janet C. Hall
United States District Judge